United States District Court
Middle District of Florida
Jacksonville Division


ANDREW LEE ROLLINGS,

      *Plaintiff,*

V.                                         **NO. 3:16-CV-885-J-PDB**

ACTING COMMISSIONER OF SOCIAL SECURITY,

      *Defendant.*

---

## Order Affirming Commissioner's Decision

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Acting Commissioner of Social Security denying Andrew Rollings's claim for disability insurance benefits and supplemental security income. He seeks reversal, Doc. 18; the Commissioner, affirmance, Doc. 19. He focuses on the Administrative Law Judge's ("ALJ's") findings concerning his lumbar spine impairment and the ALJ's reasons for not crediting his treating doctor's opinions. This order adopts the summaries of facts in the briefs, Doc. 18 at 2–10; Doc. 19 at 6–12, 14. Some evidence pertinent to the arguments is also summarized here.


## Framework

The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking whether (1) he is engaged in substantial gainful activity, (2) he has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) he can perform any of his past relevant work given his residual functional capacity ("RFC"), and (5) there are a significant

number of jobs in the national economy he can perform given his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987).

## Background

Rollings was born in 1976 and last worked in March 2012. Tr. 192, 199, 229. He has a GED, heavy-equipment training, and experience as a mechanic and welder. Tr. 229. In April 2012, he shot himself in the right leg while trying to holster a gun. Tr. 273. He alleges he became disabled in March 2012 from the gunshot wound, anxiety, depression, degenerative disc disease, sciatica, degenerative sacroiliac joint, and trouble sleeping because of pain. Tr. 192, 199, 228. He proceeded through the administrative process, failing at each level. Tr. 1–4, 19–37, 72–115, 118–44. This case followed. Doc. 1.

## Opinions of Ernst Michel, M.D.

In June 2014, Dr. Michel completed a medical assessment of Rollings's physical ability to do work-related activities. Tr. 559–62. He explained he had treated Rollings monthly since March 2012 and provided the following opinions.

Rollings experiences no medication side effects that could reasonably interfere with his ability to function in the workplace. Tr. 559. He can sit for ten minutes at a time and two hours total and stand or walk for fifteen minutes at a time and two hours total in an eight-hour workday. Tr. 559. "Positive imaging" supports that assessment. Tr. 559. He can lift up to twenty pounds occasionally and frequently. Tr. 559–60. He can use both feet for repetitive movements such as the operation of foot controls occasionally. Tr. 560. His limited lumbar range of motion and unsteady and antalgic gait support that assessment. Tr. 560. His symptoms are likely to increase if placed in a competitive work environment. Tr. 560–61. He can never climb, balance, or squat, and can occasionally kneel, crouch, crawl, bend, twist, and stoop. Tr. 561.

He has no manipulative, visual, communicative, or environmental limitations. Tr. 560–62. He cannot work five days a week, eight hours a day, fifty-two weeks a year because his "lumbar problem make[s] him unable to sit/stand [for] long periods." Tr. 562. He likely would miss three or more days a month due to his impairment and treatment. Tr. 562. The limitations apply as of March 26, 2012. Tr. 562.

## Hearing Testimony

At a 2014 hearing, Rollings testified as follows.

He lives with his wife and nine-year-old daughter. Tr. 54. His wife does not work; she drives their daughter to school in the morning, stays in town to see friends, and then drives their daughter home. Tr. 54. He stays home and sits in a recliner with his leg propped up. Tr. 55. If he tries to do anything else, he either falls or experiences increased pain. Tr. 55.

He has a GED and took courses in heavy equipment and welding at a vocational school. Tr. 48–49. He has worked as a heavy-equipment repairman for multiple companies. Tr. 49. Though he still has his tools, he no longer works on machinery because he cannot. Tr. 56.

He began seeing Dr. Michel for back problems a few months before the gunshot wound. Tr. 62. He had been taking narcotic pain medication and it became a problem, so he started Suboxone treatment. Tr. 62.

After surgery on his leg in 2012, he followed up with his internal medical doctor and the North Florida Pain Clinic. Tr. 57. He did not go back to a surgeon to talk about leg pain because he did not know that was an option. Tr. 57. He suggested amputating his leg, but doctors opined he should "keep whatever [he] could keep." Tr. 58. He did some physical therapy while at the hospital but not after. Tr. 58. He lived with his parents after the surgery because he was in a wheelchair and could not get up the three steps to his house. Tr. 58. He now lives in his own house but does not

leave often because of the steps. Tr. 58–59. When he does, he stays out only forty-five minutes to an hour because he can barely walk. Tr. 59.

In 2013, he got into an accident while riding a friend's motorcycle because someone pulled out in front of him. Tr. 50–51. He was treated for road rash and a broken left big toe. Tr. 51. He did not have the motorcycle long before he wrecked it. Tr. 52. He used it only to drive to the store a couple times a month because if he rode it for more than a few minutes, he would have increased pain and "be stuck in a chair for a day or two." Tr. 61. He does not plan on having another motorcycle because he cannot handle it. Tr. 61–62. Now, he drives a car to medical appointments or to visit his parents. Tr. 52.

In 2014, he tried to patch a leak in his wall but slipped and cut his hand with the knife. Tr. 52–53. He got stitches at an urgent-care clinic. Tr. 53.

He can do no housework, such as cleaning or washing dishes. Tr. 55. He can make a sandwich but uses disposable plates and silverware to avoid having dirty dishes. Tr. 55. He can sit on a lawn mower for an hour but will "pay for [it] for two or three days after." Tr. 56. He does very little laundry. Tr. 56. He has trouble showering and putting on shoes and pants. Tr. 63. He can shower only if he sits in a chair. Tr. 63.

He uses a cream to reduce swelling but forgot to refill the prescription. Tr. 56. He does not take narcotic pain medication because he is concerned about overusing opiates. Tr. 56–57. He wears tall "snake boots" with tight laces to reduce swelling in his leg, but if he wears them too long while upright, he cannot get them off. Tr. 59.

His pain level was about a seven out of ten at the hearing. Tr. 57. He drove to town the night before the hearing because if he had driven that morning, he would have been in too much pain to attend the hearing. Tr. 57.

He does not think he could sit in a chair to work because of pain and swelling in his leg. Tr. 59. He does not think he could work at a job where he could sit and stand at will for the same reason. Tr. 62. If he sits upright with his legs hanging down for more than two hours, he experiences swelling, pain, and numbness, and he has to prop his leg up and take medication. Tr. 59–60. If he stands too long, he experiences leg swelling and ankle bruising. Tr. 62. He needs to prop his leg up above waist height ninety to ninety-five percent of the day. Tr. 60. He cannot squat on his right leg. Tr. 60. He has used a cane since a few months after his leg surgery, but it was not prescribed. Tr. 60. He holds the cane in his dominant hand. Tr. 60–61.

The ALJ asked a vocational expert ("VE") to describe Rollings's past work. The VE responded the job is classified as a construction equipment mechanic. Tr. 65. The ALJ asked the VE to consider a hypothetical person the same age as Rollings and with his education, work experience, and the following limitations:

> He could only, in an eight-hour day, sit for two hours and stand and walk for two hours. … He could lift and carry … 20 pounds … from one-third to two-thirds of an 8-hour day.

> There would be no restrictions on the use of his hands in any way. He could only occasionally use his right and left foot. He should never climb, balance, squat. He could occasionally kneel, crouch, crawl, bend, twist, stoop. No visual restrictions. Can hear and speak and none of our environmental restrictions as well.

Tr. 65. The VE testified the limitation to two hours sitting, standing, and walking would eliminate all work. Tr. 66

The ALJ asked the VE to assume the hypothetical person had the following limitations:

> He could lift and carry 10 pounds frequently, 20 pounds occasionally. He could sit for 8 hours or he could sit and stand for 8 hours, but if … standing would need to alternate his body posture every 30 minutes. He could walk for a total of 4 hours in a day.

5

He should never climb ropes, ladders[,] and scaffolds, but could occasionally do ramps and stairs and occasionally bend, balance, stoop, squat, crouch, crawl[,] and kneel.

He has full use of his upper extremities. He can see, hear[,] and talk. He should avoid heights and vibrations.

Tr. 66. The VE testified a person with those limitations could not perform Rollings's past work as a construction equipment mechanic but could work as a ticket taker, cashier II, and ticket seller. Tr. 66. Those jobs could be performed with a sit/stand option. Tr. 67. Elevating feet or legs at a footstool level could be accommodated but not elevating them at waist-level or higher. Tr. 67.

## ALJ's Decision

At step one, the ALJ found Rollings has not engaged in substantial gainful activity since the alleged onset date. Tr. 24.

At step two, the ALJ found Rollings suffers from the severe impairment of "status post gunshot wound to the right leg." Tr. 24. She found Rollings's "lumbar spine disorders and reports of anxiety, depression, and opioid dependency" are not severe because they "did not impose vocationally restrictive limitations on the claimant for a period of twelve continuous months" and "no doctor has imposed any work restrictions on the claimant related to these conditions." Tr. 24.

At step three, the ALJ found Rollings has no impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 26. She particularly considered listing 1.00 (musculoskeletal system). Tr. 26.

After stating she had considered the entire record, the ALJ found Rollings has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)[1] with additional limitations:

> [T]he claimant can sit for a full eight hours or alternate sitting and standing for eight hours with the opportunity to alternate his posture every 30 minutes. He can walk for four hours in an eight hour day. The claimant should also never climb ladders, ropes, or scaffolds, and he can occasionally climb ramps or stairs as well as occasionally bend, balance, stoop, squat, crouch, crawl, or kneel. In addition, the claimant has full use of his upper extremities, and he can see, hear[,] and talk without restriction. The claimant must also avoid work around heights and vibrations.

Tr. 26.

The ALJ summarized Rolling's testimony and found his medically determinable impairments could reasonably be expected to cause his alleged symptoms but his statements on the intensity, persistence, and limiting effects of the symptoms are "not entirely credible because they far exceed the level of severity revealed in the claimant's objective medical records and longitudinal treatment history." Tr. 27. She described the medical evidence and observed no doctor had imposed work restrictions after the gunshot wound, Tr. 27; he had not visited a vascular surgeon, completed physical or occupational therapy, or had follow-up treatment other than pain management, Tr. 27; medications and cream helped his symptoms, Tr. 28, 29; and imaging and exams showed unremarkable or benign findings, Tr. 28, 29.

On Rollings's daily activities, the ALJ explained,

---

[1]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. " 20 C.F.R. §§ 404.1567(b), 416.967(b).

Even at the claimant['s] recent disability hearing, he testified that he can still complete a variety of activities of daily living and wears compression stockings and tight boots to manage any intermittent lower extremity swelling. Specifically, the claimant testified he can independently perform his personal care tasks, he uses a chair in the shower to assist with this process, he helps care for his nine-year-old daughter, he drives short distances, he can use the sitting lawnmower for an hour, and he completes light housework despite the alleged severity of his impairments.

The claimant also asserted that his treatment records indicated he had no lower extremity swelling (i.e. edema) and testified that he must elevate his legs during 90% to 95% of the day despite medication. The claimant added that his use of a cane is not prescribed; and he explained that he wears compression stockings, often tightens his boots, and has benefited from the use of prescribed topical cream to manage any intermittent edema. Overall, such testimony suggests the claimant can engage in a higher level of physical and mental functioning than alleged. The claimant's ongoing ability to ride a motorcycle until July 2013 and his completion of drywall tasks and routine household repairs until June 2014 also supports this finding and weighs against the claimant's credibility as a whole.

Tr. 29–30.

The ALJ concluded, "I do not accept his testimony that he cannot sit or do anything from a physical perspective because such claims are inconsistent with the medical evidence or record as a whole." Tr. 30.

Regarding Rollings's allegations of back pain, the ALJ wrote,

His prior lumbar spine magnetic resonance imaging (MRI) scans were unremarkable other than arthritis in two areas, and the claimant's back pain was successfully managed conservatively with yoga, consistent use of a TENS unit, and medications such as Percocet. Likewise, the claimant had a positive response to Soma, Ambien, and Wellbutrin for his reported muscle spasms, sleep issues, and anxiety (Exhibits 2F at pp.71–73, 4F).

Tr. 28. She also wrote,

Moreover, from September 2012 to September 2013, the claimant complained of increased lower back and right leg pain, alleging trouble walking for long periods, but he continued to achieve benign exam findings with no lower extremity swelling, no motor or sensory deficits, and full muscle strength in all extremities (Exhibits 5F; 6F at pp. 1, 3, 5, 7). Likewise, the claimant's October 2012 to August 2013 treatment records reflect a good to moderate response to conservative treatment, and the claimant[] reported improved anxiety and insomnia with Ambien in November and December 2012 (Exhibit 6F).

Tr. 28.

Regarding Dr. Michel's opinion, the ALJ explained,

In light of the totality of the evidence, I give little weight to [the] June 2014 medical opinion of Dr. Michel who notes the claimant is limited to performing light work with no climbing, balancing, or squatting. Dr. Michel also opined the claimant will likely miss three or more days of work each month due to his history of lumbar spondylosis and related treatment, and Dr. Michel cited positive imaging as a basis for his opinion that the claimant cannot sit or stand for more than two hours in an eight-hour workday (Exhibit 10F). However, the medical evidence does not substantiate this finding and instead shows progressive reduction and management of the claimant's back pain since his alleged disability onset date. Additionally, Dr. Michel did not perform independent functional testing to support his opinion and there is no objective evidence of the claimant having excessive absenteeism or repeated hospital visits or treatment that would require him to miss multiple days from work (Exhibit 1F–11F). The claimant's May 2014 treatment and stitches for a right hand cut with a drywall knife does not undermine this finding because the claimant quickly recovered with complete healing by June 2014 (Exhibits 9F, 11F).

Tr. 29.

The ALJ explained she gave little weight to a February 2013 state-agency physical assessment stating there is insufficient evidence to adjudicate Rollings's reports of worsening conditions. Tr. 30. She explained,

As noted in further detail, the claimant engaged in medication and pain management after February 2013. He also continued riding a motorcycle until his July 2013 accident, he repaired a hole in the wall using a

drywall knife as recent as June 2014, and he testified that he continues
to complete activities of daily living that suggest he can perform at least
limited light exertion work tasks.

Tr. 30.

At steps four and five, the ALJ found Rollings cannot perform his past relevant
work[2] but can perform jobs the vocational expert identified (ticket taker, cashier II,
ticket seller) and those jobs exist in significant numbers in the national economy. Tr.
30–31. She therefore found no disability. Tr. 32.

## Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ
applied the correct legal standards and whether substantial evidence supports his
findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial
evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable
person would accept as adequate to support a conclusion." *Id.* A court may not decide
facts anew, reweigh evidence, make credibility determinations, or substitute its
judgment for the Commissioner's judgment. *Id.* A court must affirm the ALJ's
decision if substantial evidence supports it, even if the evidence preponderates
against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## Law & Analysis

Rollings argues the "Commissioner's finding that [his] lumbar spine
impairment did not cause more than minimal limitations for more than twelve
months is not supported by the record … and tainted the analysis of [his] pain and
other symptoms." Doc. 18 at 10–19. The Commissioner responds substantial evidence

---

[2]"Past relevant work is work [a claimant has] done within the past 15 years, that was
substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R.
§§ 404.1560, 416.960.

supports the finding the impairment was not severe and, regardless, Rollings has not satisfied his burden of showing harmful error. Doc. 19 at 5–7.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant must prove he is disabled. 20 C.F.R. §§ 404.1512, 416.912.

For step two, an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Severity "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986). Existence of an impairment alone does not show its effect on ability to work. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). An ALJ should draw no inference from a physician's silence on a claimant's ability to work. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).

Step two "acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment … is enough to satisfy the requirement." *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). Failure to find an impairment severe at step two is harmless if the ALJ moves on to step three and considers the claimant's conditions in combination in the rest of the decision. *Medina v. Soc. Sec. Admin.*, 636 F. App'x 490, 492–93 (11th Cir. 2016).

A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The Social Security Administration uses the RFC at step four to decide if he can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy he can perform. 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5).

To determine the RFC, an ALJ considers all relevant evidence, including medical evidence and the claimant's description of pain or limitations. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine whether there is an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptom arising from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the objective medical evidence does not confirm the alleged severity of a claimant's symptom, but an impairment can be reasonably expected to cause that alleged severity, an ALJ must evaluate the intensity and persistence of alleged symptoms and their effect on ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). An ALJ must consider all available evidence, including objective medical evidence and statements from the claimant and others. 20 C.F.R. §§ 404.1529(c)(2)–(3), 416.929(c)(2)–(3). An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

If an ALJ discredits a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, such as pain, she must provide "explicit and adequate reasons for doing so." *Holt*, 921 F.2d at 1223. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

A reviewing court should ask not whether the ALJ could have reasonably credited a claimant's testimony, but whether the ALJ had been clearly wrong in discrediting it. *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Despite that Rollings complained work activities exacerbated back pain, *see, e.g.*, Tr. 383, 385, 389, 394, medical providers told him to use a back brace at work, *see* Tr. 393, 395, 397, 398–99, Dr. Michel attributed 2014 limitations to the lumbar spine impairment, *see* Tr. 560, and the ALJ should have drawn no inference from the absence of functional limitations, *see Lamb*, 847 F.2d at 703, substantial evidence supports the ALJ's finding at step two that Rollings's lumbar spine impairment was not severe; i.e., did not significantly limit his ability to do basic work activities. Among other things, Rollings worked for years with it, and it had not worsened. The ALJ's determination the impairment imposed no vocationally restrictive limitations for more than a year recognized those facts. *See* Tr. 24.[3]

Even if substantial evidence did not support the ALJ's finding at step two that Rollings's lumbar spine impairment was not severe, the error is harmless because the ALJ moved to step three and considered all of Rollings's conditions—including his lumbar spine condition—in the rest of the decision. *See* Tr. 26–30; *Medina*, 636 F. App'x at 492–93. The ALJ described records showing he had received a prescription for a back corset in 2007 due to soft-tissue pain from a car accident; magnetic

---

[3]Rollings contends the ALJ's statement the lumbar spine impairment "did not impose vocationally restrictive limitations on the claimant for a period of twelve continuous months" conflicts with medical evidence showing he had been treated for low-back pain for years by pain management with narcotics, physical therapy, and injections; the pain did not cease with the gunshot wound; and he continued to receive diagnoses relating to the lumbar spine. Doc. 18 at 14–15; *see, e.g.*, Tr. 384 (April 2011 record listing diagnoses of lumbosacral spondylosis without myelopathy and low back pain), 565–66 (August 2014 record listing diagnoses of lumbosacral spondylosis, low back pain, muscle spasm, sacroiliitis, and others). There is no conflict: the ALJ's finding concerned the length of any vocationally restrictive impairments, *see* Tr. 24, not the length of any diagnoses or treatment, which do not alone show vocationally restrictive impairments. *See Moore*, 405 F.3d at 1213 n.6.

resonance imaging of his lumbar spine had been unremarkable other than arthritis in two areas; he had treated back pain through yoga, use of a TENS unit, and medication; hospital discharge notes had diagnosed him with a history of lower back pain; he had failed to complete therapy or follow-up with treatment other than pain management despite "ongoing complaints" of lower back pain and right leg pain; he had had a positive response to medication for muscle spasms; and he had had normal physical findings despite continuing complaints about back pain. Tr. 26–29. The ALJ found no evidence of worsening of his lower back impairment and ultimately found he can only do light work with many other limitations. Tr. 26–29. The record refutes Rollings's contention, "Because the ALJ did not understand the lumbosacral spondylosis remained a significant impairment at all relevant time periods, the ALJ necessarily failed to properly analyze Mr. Rollings' pain." Doc. 18 at 18.

Rollings contends the ALJ's statement that he "completes light housework" does not fairly state his testimony. Doc. 18 at 23–24. Substantial evidence supports that characterization: he testified he can get up and make a sandwich and does some of the laundry (albeit very little) and reported he takes care of his daughter some, helps care for two dogs, can prepare his own food if he does not have to stand for too long, and can do some laundry because he can sit. Tr. 55–56, 235.

Rollings contends the ALJ should not have relied on his ability to ride a motorcycle because he did not ride for very long and wrecked it. Doc. 18 at 24. His ability to ride a motorcycle was just one of many reasons the ALJ articulated for not entirely crediting his testimony. *See* Tr. 27–30. The ALJ was not wrong to include it. He testified he rode a motorcycle for "not very long" and the wreck was caused by someone pulling in front of him. Tr. 50–52. The ability to ride a motorcycle may reasonably be deemed inconsistent with allegations of completely disabling symptoms.

Rollings contends the "ALJ's focus on the drywall injury was misplaced" because "[f]ixing an emergency home issue by cutting a hole in a wall does not equate

to being able to work on a full time sustained basis—particularly when he injured himself doing so." Doc. 18 at 23. The ALJ did not use his attempt to repair the drywall as evidence he could work on a full time sustained basis but as one of many facts indicating his impairments are not as limiting as alleged. The repair attempt could reasonably be viewed as inconsistent with allegations he can do virtually nothing but sit in a recliner all day.

Besides referencing the ability to do light housework, ride a motorcycle, and repair drywall, the ALJ articulated other reasons for finding Rollings not entirely credible, including that his allegations are inconsistent with medical records showing a good response to conservative treatment, the lack of treatment beyond medication and pain management, and records showing no edema or significant reduction of edema with topical cream. Tr. 26–29. Substantial evidence supports those reasons. *See, e.g.* Tr. 414 (May 2012: reporting relief from medication, being active, and doing stretching exercises), 437 (September 2012: reporting medications were helpful and he would like to decrease the dose), 468 (December 2012: reporting "feeling well without specific complaints"; examination showing normal musculoskeletal range of motion, normal gait, 5/5 muscle strength in all extremities, and no lower extremity swelling), 472 (January 2013: same), 474 (February 2013: same), 476 (March 2013: same), 478 (April 2013: same), 480 (May 2013: same), 537 (October 2013: cream reduces leg pain from 8/10 to 6/10); 567 (July 2014: medication providing good pain relief; cream provides decreased pain and swelling/edema in right leg, ankle, and foot), 565 (August 2014: medication provides good pain relief). The ALJ was not clearly wrong in discrediting Rollings's testimony.

Rollings argues the ALJ did not articulate good cause to discount Dr. Michel's opinions and instead made arbitrary RFC findings. Doc. 18 at 19–25. He contends the ALJ, in determining the weight to give Dr. Michel's opinions, ignored records from other medical providers on his lumbar spine impairment, stated that impairment had improved when it had not, and did not consider the combination of impairments from

the gunshot wound and the lumbar spine impairment. Doc. 18 at 20–23. The Commissioner responds the ALJ correctly discounted Dr. Michel's opinions because the objective evidence does not support them. Doc. 19 at 10–12.

Regardless of its source, the Social Security Administration "will evaluate every medical opinion" it receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a), 416.927(a). Opinions on issues that are dispositive of a case, such as whether a claimant is disabled or able to work, are not medical opinions because they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). The Social Security Administration generally will give more weight to the medical opinions of treating sources[4] because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart,*

_____

[4]A treating source is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. §§ 404.1502, 416.902. An ALJ "may consider an acceptable medical source who has treated or evaluated [a claimant] only a few times" a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." 20 C.F.R. §§ 404.1502, 416.902.

*357 F.3d 1232, 1240 (11th Cir. 2004)*. Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41.

Unless the Social Security Administration gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. §§ 404.1527(c), 416.927(c). The Eleventh Circuit has emphasized, "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

Here, the ALJ described Dr. Michel's opinions[5] and articulated good cause for giving them little weight: medical records do not support the opinion that positive imaging shows Rollings cannot sit or stand for more than two hours in an eight-hour day, medical records show progressive reduction and management of his back pain, Dr. Michel performed no independent functional testing, and there is no objective evidence of excessive absenteeism or repeated hospital visits that would cause him to miss work. Tr. 29.

Substantial evidence supports those reasons. Dr. Michel did not specify what imaging supports his opinions, but September 2007 imaging was "relatively unremarkable" and showed "[m]inimal facet arthropathy L4-L5 and L5-S1 but no other abnormality" other than "one tiny Schmorl's node seen at the inferior endplate

---

[5]The ALJ's acknowledgment that Dr. Michel based his limitations on Rollings's lumbar spine impairment shows she did not overlook that evidence, despite stating at step two that no doctor had imposed restrictions related to the condition. *See* Tr. 24, 29.

of T9," Tr. 431–32; September 2008 imaging was "unremarkable," Tr. 430; and July 2009 imaging was "unremarkable" with no significant interval change, Tr. 429. The ALJ did not err in considering those results do not support the opinions on Rollings's ability to sit and stand. Multiple treatment records document Rollings had a good response to treatment and received pain relief from medications, supporting the ALJ's statement that the record shows reduction and management of the back pain.[6] *See, e.g.* Tr. 414 (May 2012: reporting relief of back pain from being active and doing stretching exercises), 437 (August 2012: reporting medications were helpful and he would like to decrease the dose), 468 (December 2012: reporting "feeling well without specific complaints"; examination showing normal musculoskeletal range of motion, normal gait, 5/5 muscle strength in all extremities, and no lower extremity swelling), 472 (January 2013: same), 474 (February 2013: same), 476 (March 2013: same), 478 (April 2013: same), 480 (May 2013: same), 565 (August 2014: medication provides good pain relief).[7] The ALJ did not err in considering that Dr. Michel did not perform independent functional testing—given that imaging reports do not support his opinions and his treatment notes document that medications provided effective relief from back pain, it is unclear how he arrived at his opinions.

Rollings complains it is unfair to consider the lack of evidence of work absences when he has not worked since his alleged onset date. Doc. 18 at 24–25. Though he is correct one could not expect to see evidence of work absences when a claimant has not been working, the ALJ is correct that the record contains no evidence of regular medical treatment or hospital visits that would cause Rollings to miss three or more

---

[6]Rollings suggests notes stating medications alleviated his pain might have been due to transcription errors because he continued to rate his pain around a seven out of ten. Doc. 18 at 22–23. Given that there is no explanation of the pain rating, it is impossible to know if it describes pain with or without medication. Regardless, other medical records document effectiveness of medications.

[7]The record also supports some slight reduction in overall pain levels. *See* Tr. 412 (April 2012: rating pain a seven out of ten), 565 (August 2014: rating pain a six out of ten).

days of work each month.[8] In any event, any error in noting the lack of evidence on absences is harmless given the other substantial evidence that supports the ALJ's assignment of weight.

Rollings argues that, after discounting Dr. Michel's opinion, there was no other opinion on which to base the RFC findings and substantial evidence therefore does not support them. Doc. 18 at 20, 24–25. The Commissioner responds the ALJ did not need to base her RFC findings on a medical source statement and correctly based the RFC findings on other evidence in the record. Doc. 19 at 12–13.

The ALJ assesses a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). She need not defer to any medical opinion concerning a claimant's RFC. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). She may adopt opinions expressed in a medical source statement, but a medical source statement is not an RFC assessment. Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *5 (July 2, 1996). An ALJ must assess medical opinions with all other relevant evidence to assess the RFC. *Id.*; 20 C.F.R. §§ 404.1527(b), 416.927(b), 404.1545(a), 416.945(a).

An ALJ does not "play doctor" when evaluating a claimant's RFC, *Castle v. Colvin*, 557 F. App'x 849, 853–54 (11th Cir. 2014), even absent a medical opinion concerning the claimant's limitations, *cf. Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923–24 (11th Cir. 2007) (finding substantial evidence supported ALJ's RFC finding even after he discredited only medical evaluation in record because he relied on office visit records). Many courts in this circuit have affirmed an ALJ's RFC assessment made without an assessment from a treating or examining physician. *See Packer v.*

_____

[8]Moreover, a claimant cannot be found disabled based on the need for excessive medical appointments because the number of medical appointments a claimant attends is not a functional limitation caused by his impairments, particularly if nothing indicates the claimant would be required to schedule his appointments during work hours. *Cherkaoui v. Comm'r of Soc. Sec.*, 678 F. App'x 902, 904 (11th Cir. 2017). It is unclear if Dr. Michel's opinion that Rollings would miss three or more days of work each month was based on a need for regular medical appointments or exacerbations of his impairments. *See* Tr. 562.

*Astrue,* No. 11-0084-CG-N, 2013 WL 593497, at *3 (S.D. Ala. Feb. 14, 2013) (unpublished), *aff'd,* 542 F. App'x 890 (11th Cir. 2013) (citing cases).

Here, substantial evidence supports the ALJ's RFC assessment. She reviewed medical records showing complaints of leg and back pain, antalgic gait, and limited lumbar range of motion but no lower extremity swelling, no motor or sensory deficits, full muscle strength, and good to moderate response to conservative treatment; unremarkable imaging reports; reports that Rollings was "feeling well without specific complaints"; and Rollings's reports of his daily activities. *See* Tr. 27–30. That evidence supports the ALJ's finding that Rollings can perform light work with additional limitations. Rollings points to evidence from which the ALJ could have found additional limitations, but the Court must affirm a decision if substantial evidence supports it, even if the evidence preponderates against it. The ALJ was not required to defer to a medical opinion and did not err by giving Dr. Michel's opinions little weight and instead relying on other medical evidence.

### Conclusion

The Court affirms the Commissioner's decision and directs the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on September 25, 2017.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      Counsel of Record